Return to the next case which is the Kodak et al. versus BAP May it please the court, good morning. My name is Derek Brandt. Just wait a second until we get settled a little bit. We won't start your time. Just want to make sure everybody is seated before we start so we can hear you clearly. May it please the court, good morning, your honors. My name is Derek Brandt. I represent the plaintiff appellants Kodak, AGFA, Fujifilm, and MAG, also referred to in the papers as the IPs. Aluminum III guides this appeal but dictates that as to the plaintiffs before the court today, the court should reach the opposite result and there's three specific reasons for that. First, unlike the Aluminum III plaintiffs, the plaintiffs here today claim that the restrained market is the physical aluminum market and that we suffered classic antitrust injury in that market. But what does the word directly mean in Aluminum III? Because Aluminum III, I'm sure you're very familiar. Aluminum III says that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained. Now I take it you are arguing that it is the physical aluminum sales market that is restrained and you're saying it is directly restrained? That is our claim, Your Honor, that the physical aluminum market is at least one of the directly restrained markets in the case. Now, as Judge Jacobs hypothesizes at the end of Aluminum III, it's possible that there is more than one market that somebody could describe as directly restrained, but certainly the physical aluminum market is a directly restrained market. It does not mean, that passage does not mean that you have to be a participant in the market in which the anticompetitive conduct itself occurred. I don't think that's what it means, Your Honor, although in this case we also have anticompetitive conduct in the physical aluminum market. And let me expound just for a second. In the paragraph of Aluminum III that says the upshot is, the first sentence says something like, you must be in the directly restrained market, but the last sentence of that same paragraph says, regardless, antitrust injury is suffered by participants in the restrained market or markets. And I think that's an important point. All this conduct took place, if at all, in the LME warehouse storage market, and that is where the direct immediate impact would have been felt. So doesn't that clarify that? Well, I don't think that all of the conduct took place in the warehouse storage market, for reasons that I'm happy to go through, but even if it did all take place in a warehouse storage market, consistent with Aluminum III and with McCready and with Krimper's and the other cases like that, there can also be a classic antitrust injury suffered by the object of the conspiracy. The Midwest premium, which derives from the LME warehouse market, directly affects the market that you are talking about because the pricing in your market, the pricing in the market in which you participate includes the Midwest premium. Isn't that right? That's exactly right, Your Honor. The Midwest premium actually only exists in the physical aluminum market. If I understand the theory of your complaint, the defendants were taking steps collusively, according to your claim, that were meaningless in the LME warehouse market because the LME warehouse market is not one in which participants are withdrawing aluminum to put it into commerce because that's aluminum which is simply held there while the trading entities trade and do what they want, and with a two-year delay in withdrawal, nobody would have any interest in withdrawing that aluminum from the LME warehouses and the sole significant import, if I understand it, of the collusive conduct that you are alleging is to increase the prices in the market for the sale of aluminum through, for example, supply contracts. Is that right? That is what we say is the object of the conspiracy. It was to increase the price in the physical market, the key fact being that the defendants are prodigious sellers of aluminum in the physical market, so it was in their interest to do that. Let me just make one quibble with what Your Honor said, and that's that aluminum that is stored in an LME warehouse is also part of the supply to the physical aluminum market. It's one of the sources of supply. Theoretical last resort. It can be the marginal supply, and when that supply is restrained, as it was by the defendants, that created the increase in price. But your theory is that the reason that the defendants— your theory, if I understand it, is that the reason that the defendants collusively bottled up the mechanisms of the LME warehouse was solely, or at least primarily, to make the price jump in the market in which you participate, the market for the sale of aluminum, because the Midwest premium is a part of that price. Exactly correct, Your Honor. It was to increase the price in the physical aluminum market where we are purchasers and the defendants are sellers. And this, in your allegations, is the intended effect of the— what we would have called below the shenanigans in the warehouse market. That was the intended outcome, was to affect the physical aluminum market. That's your allegation. It was the object of the conspiracy, and— No, it was—so this is not what Judge Jacobs was referring to as collateral damage. Collateral damage is not what you—you know, if you drop a bomb, and unfortunately some civilians are killed, they are not appropriately referred to as collateral damage if your purpose was to blow them up. That's exactly right, Your Honor. We can't be both the intended target or effect and collateral damage at the same time. Judge Jacobs hypothesized at the end of the Aluminum III decision exactly the scenario here at page 163 where he says, if the defendants could not by themselves increase the price for physical aluminum, one alternative might be to manipulate the LME warehouse market. That's a very peculiar paragraph because it winds up by saying, nevertheless, everybody's still collateral damage. So I guess what I'm trying to get at is, I think I understand your theory. I think I understand why it is different than the theories of the plaintiffs who were at issue in Aluminum III. And so is your argument basically that we need to take the language that the defendants cite from Aluminum III as effectively limited to the kind of plaintiffs who were there and the kind of allegations that were made in that case? Well, I think this case is different because of the fact that the defendants are sellers of aluminum, in our case, as clearly alleged and shown, and because the plaintiffs in Aluminum III only argued a McCready theory of antitrust injury, which is different from what we argue. This is a sort of collateral question. By accident, I took home to read, the first time I was working on this case, the redacted briefs. When I got to the end of the redacted briefs, I thought, what do these guys actually have as a case? And I went back to the office and dug out the unredacted briefs and found out that everything that was redacted was all the evidence that they are sellers in the aluminum market. And suddenly, your case sprung into a somewhat different view. I take it those items were not redacted at your instance. That's correct, Your Honor. At some point in this case, it seems to me we're going to have to address the question of what justifies those redactions, because it seems to me if we wind up deciding this case against you, the public might have a very misled, and the purpose of public access to court documents is so that the public, I realize this does not mean the man in the street, this probably means the business, press, and experts in antitrust law, that the public should have the opportunity to evaluate whether our decisions make any sense. And they'd have a rather different view of it, it seems to me, if they could see the entirety of your brief. This has nothing much to do with whether you win or lose, I take it, because we have seen those materials and we'll take them into account. But at some point, somebody's going to have to explain to us why those materials should remain redacted or why this is the equivalent of how to make a nuclear bomb or the secret formula for Coca-Cola, to find out that, much to my surprise, a company like Goldman Sachs is knee-deep in selling physical aluminum. But anyway, that's a side point. Let me just ask you a question, if I could. It sounds like you're not challenging Aluminum 3, probably because you can't, because we're bound by it. But maybe you could tell me how your clients are different from the commercial end users and the consumer end users that were in Aluminum 3. Well, I think the key difference, or maybe several key differences, are that the consumer and the commercial end users didn't have the claim that the defendants were prodigious sellers of aluminum, didn't have the argument that this conspiracy was targeted at the physical aluminum market, and also, as Judge Jacobs noted, they were in some way remote, whereas my clients pay the actual benchmark Midwest premium that is manipulated by defendants, we say, and pay that in the first instance. We pay it as a matter of our contracts, as an inescapable matter of our contracts. So the Midwest premium is built into the supply contracts that your clients are party to? That's correct, Your Honor. The contract will say the pricing for X volume of aluminum is determined by two elements, one, the LME cash price, and two, the Midwest premium as of a date, say, month minus two from delivery, something like that. Did the indirect, nobody in Aluminum 3, none of those plaintiffs alleged that they had contracts that were affected by the Midwest premium, or did they not? Well, I don't know if they specifically alleged what I just reflected that my client's contracts say. I think they said that increases to the Midwest premium were passed down to them. I can't go further than that. Well, I mean, it gets complicated because you've got these two separate issues of antitrust injury and most efficient enforcer, and the fact that they're sort of, these people have an Illinois brick problem goes to the second issue and not the first. And that issue is not before the court. I understand. But it seemed to me, in reading the complaint of those indirect purchasers, that they were alleging that the defendants were trying to affect the market, and that that's because they were sellers of aluminum. My read of what they were saying, based on the Aluminum 3 decision, which is what I have to go by, is that they were saying these guys did some bad stuff in an LME warehouse, and it had an impact on us. Is it fair to say that your point, yeah, I mean, that's an interesting question, and it's one I wanted to raise with you and with the defendants. Does intent matter here? In other words, it's one thing to say people conspired to restrain this market, and maybe they did that in a hypothetical case, or even in this case, in order to just raise the rents in the warehouse market. And alas, that had ripple effects all through the economy for all kinds of reasons, foreseeable, unforeseeable, whatever. It's a different thing to allege that the reason they were screwing around with the warehouse activities was precisely to have an impact in the further market. Well, and that is what we claim, Your Honor. In that case, it would be the people who paid more rent to the warehouse would be kind of McCready appointees. Exactly. And you would be the direct appointees in that kind of scenario, if that's what bears out. That would be the precise paradigm, I would suggest, and I think Judge Jacobs suggested, Your Honor. And one last thing. So really, your best case maybe, or at least your best case that I happen to be intimately familiar with, is LIBOR, because what you're saying is this was a conspiracy to fix one of the components of the prices. And let me just – am I right so far? By LIBOR, I assume you mean what's listed as Gell-Bohm that Your Honor was on the panel. Yes, yes. And let me try to get at one other thing, because I don't know that I fully understand about the economics of this case. It seems to me that this LIBOR kind of theory, this Gell-Bohm kind of theory of fixing a component of a price, am I right that this makes sense mostly with respect to existing supply contracts that reference a fixed price that's fixed by reference to, among other things, the Midwest premium? Well, Your Honor, I can't say – The price in which the Midwest premium is baked in? I don't know that I can say specifically with respect to existing contracts, but certainly in this industry of people that are buying primary aluminum, physical aluminum at the top of the chain, this is the way the industry works. And I think the defendants knew that and knew that they could then sell aluminum at that formula. I'm having trouble understanding how that could possibly apply in a spot market. In other words, if, as is alleged, in the time period covered by this activity, aluminum is a glut on the market. Now, I understand that if you restrained some chunk of aluminum somewhere, there is a difference between a market in which there's twice as much aluminum available as people want to buy and a market in which there's ten times as much aluminum as people want to buy and something like that. But I'm having a little trouble understanding why if I go to a smelter who's making aluminum in part because it's just too expensive to turn off the smelters and turn them back on next year when there's a shortage again. And that person wants to get rid of this aluminum. Why that smelter is, and the person buying, sort of looks up in a book what the price should be? How does a market work like that as opposed to, I'll offer you a nickel for all your aluminum. And the guy says, great, at least then I get a nickel. Why does supply and demand not operate in purchases of aluminum other than ones in which you've already got a contract that says you're going to supply me with all my aluminum needs for next year. And because we have to fix a fair price for that, the price will be whatever the price is in Blatt's book. Metal's Week, yeah. Metal's Week, right. I understand why that kind of contract would have that reference, but I don't understand why somebody who's just trying to buy some extra aluminum to make extra aluminum foil this year is going to ask to pay the price that's in Blatt's book rather than to go by the fact that there's supply and demand that might make it easier to negotiate a better price. Well, we're pretty far into the evidence on this, and I'm not sure I have anything in the record on this point, Your Honor. But I think it's not so much that the purchaser goes to that producer and says, I would like to buy it at such and such formula, but the producer says, if you want to buy from me, you will buy it at this formula. Why on earth would he say that if he knows that there's another competitor? Because we're not talking about Goldman Sachs here. We're talking about people who have, I imagine, I don't know what these smelters look like, giant factories where they're boiling down the bauxite and they're making aluminum that they can't sell. Why do they say we're insisting on this price unless they have a price-fixing conspiracy that goes way beyond what's anything alleged here? Well, all I can say, Your Honor, is that I think in what is sometimes called the spot market, which I think different people have different definitions of what that means, is that pricing is still done in that same fashion. So I have a further problem, but what I don't understand is if the defendants, by doing what you allege, have caused the price of aluminum to be inflated unreasonably, to be inflated artificially, I mean, how do they make money out of that? Because they sell aluminum, but if they need to buy the aluminum in order to sell it to you, they need to pay that inflated price as well. So how do the defendants, what explains the profit motive of the defendant to inflate the price of aluminum if that's going to affect them in acquiring aluminum as well as affecting you in buying it from them and others? Well, I think there's a couple of answers likely to Your Honor's question, and one is at a very minimum it's the long game for them. What they buy today, if they can inflate the price of it by tomorrow or next week, they can sell it for more tomorrow or next week. The other answer, though, is that they can acquire aluminum by buying warrants for aluminum that's in a warehouse or not in a warehouse, I guess which would be non-warranted metal, but they can acquire and then hoard that aluminum the way that we've alleged in the complaint. They would acquire it in an LME warehouse, accumulate it there for some time, and then at some time in the future withdraw it and sell it at this inflated price. That's correct, Your Honor, yes. I'm well over my time. Thank you, Your Honor. We have Mr. Cox. I had the three of you proceeding together, but I'm open to a different approach. Palmerschein is third, but if you want to go first, go ahead. Thank you, Your Honor. Sorry, so who are you? Robert Palmerschein. I'm here on behalf of Appellant's Reynolds Consumer Products and Software Company. Defendants sold aluminum to my clients and charged them the illegally inflated Midwest premium. And as purchasers of a price-picked product directly from the price fixers, we believe we've alleged the quintessential antitrust injury. As to a question about aluminum-3 that Your Honor had asked, I think it's plain from a reading of aluminum-3 that that case was decided on the basis that the defendants were not in the primary aluminum market. And I think that's pretty clear from a reading of it. I saw that, but, I mean, how are they different from the plaintiffs here? I mean, are you saying that aluminum-3 is right as to those two groups, but that's because we are very different, or are you saying aluminum-3 is wrong? No, I'm not saying aluminum-3 is wrong. I think the holding of aluminum-3 was based on the consumers and commercials' complete disavowal of participation in any markets that the defendants participated in. They disavowed participation in any of the markets in which the defendants operated.  Our situation, of course, is much different. They basically argued, certainly primarily they argued a McCready theory, which is really what aluminum-3 was addressing. That's correct. I mean, aluminum-3, I think, addressed the issue of injury if you're not a consumer or competitor in the defendant's market, or if you're not the fulcrum of the conspiracy under a McCready-type theory. And, again, we're purchasing directly from these defendants in the primary market. So I think for the defendants to say that aluminum-3 is dispositive here is just simply a bridge too far. You know, I think that's sort of where the district court got hung up in its analysis. And when looking at the claims that we brought, I think it overlooked a number of rules from this court, particularly in the Gelboim decision, that really should have framed the analysis. And one of those is that when defendants collude to distort prices in a market that they sell into, so here, aluminum, consumers in that market are directly restrained. The district court carved out the purchasers initially from aluminum-3, and then on remand she then said, well, but aluminum-3 applies to these three groups as well, ultimately, right? Correct. Correct. Although, if you look at the district court's order dismissing what are referred to as the FLPs, Mr. Coughlin's claims, she, in fact, said it would be possible to develop a traditional antitrust injury theory here, but then went ahead and disregarded the complaint and the amended complaint that we had filed, which asserted traditional antitrust injury as a customer of these defendants. And I think in that analysis, and the court sort of just focused on what would happen in the warehouse market, it kind of lost the big picture of what the purpose and effect of the conspiracy was. I mean, I'm sympathetic to the district court here. Judge Forrest alluded to the fact that, and again, this comes somewhat from my experience with the LIBOR cases, that when the Supreme Court said in Gelboim that you can have an interlock, well, not an interlockatory appeal, I mean, I understand their position, the Supreme Court's position here. If one set of plaintiffs has filed a complaint, has that complaint dismissed, I certainly understand the logic that then they get to appeal because that's a final decision in their case, even though it's part of an MDL. The problem is that in these complex MDL litigations, that may mean that the first thing that comes to an appellate court is kind of the weakest complaint framed in the weirdest way, and then if the appellate decision in reference to that, focused on that case, may use language that can then be applied more broadly, it creates problems down the road, and Judge Forrest explicitly said that, and, you know, I think you'd have to agree, wouldn't you, that there certainly is language in Aluminum III that is not helpful to you? I think that there may be Aluminum III language in there that's not helpful to us if you view it under the limited facts of what was in that case, which is the plaintiffs have disavowed participation in any of the markets and, therefore, had to resign. That's how you would distinguish that language is you'd say that that's dictum or that goes beyond the facts or that has to be understood in light of the particular facts of the case or something like that. But, yeah, but I also think, though, that Aluminum III is helpful in understanding the analysis that the district court should have engaged in, and part of that is, I think, Judge Jacobs' observation that a single antitrust conspiracy can restrain multiple markets and it can impact numerous distinct types of injuries, and, you know, as Mr. Brant had pointed out, he really posed the hypothetical, which is the basis of what we've alleged in our amending complaint, which is, you know, if they couldn't directly restrain the physical market through, you know, control of it, you know, one option would be to corrupt the warehouse market. And, you know, I think that language harkens back to what this court said in Gell-Boynt, which is you need to look at the purpose and effect of the conspiracy. So here, horizontal price fixing, and, you know, the defendants, you know, here use the warehouses as the tool to accomplish their anti-competitive ends. And I think under Gell-Boynt, the point is that, you know, the machinery doesn't matter. And so if the defendants do this through corrupting the warehouses or if they do that by colluding to insert illegal prices into our contracts with them, the conclusion on antitrust injury has to be the same. And remind me, you're at the 12B6 stage. This is a complaint that was not even filed at the time that Aluminum III was decided, or at least the time the Aluminum III plaintiffs filed their complaint. Well, we had filed before the Aluminum III decision. The defendants moved to dismiss the Alvo FLPs, never moved against us or Mr. Brand's clients. And then the district court just sua sponte dismissed us. So our original claim, we believe, asserted facts that supported the traditional antitrust theory. But in light of the judge's order saying a traditional antitrust theory is possible to develop here, we filed an amended complaint, which we believe we had an absolute right to do because the defendants had never responded to our complaint. And it's our position that, you know, that's what the court should have proceeded on and that the court had conducted the correct analysis, which would be the analysis that this court employed in Gell-Boynt. The conclusion that we have alleged antitrust injury is just inescapable. Unless there's further questions, I'm willing to move to him. Yes, Mr. Coughlin. May it please the Court, I'm Patrick Coughlin on behalf of the proposed class, which consists of 286 entities throughout the country that pay, in the first instance, their direct purchasers. They pay the LME price plus the Midwest premium. And, Your Honor, you had asked about how this pricing works. Why doesn't somebody just walk in and say, hey, you know, I'll pay you X for this on the spot market? Well, aluminum, the pricing of aluminum is set in the following way. It is set first out in the macroeconomic world, real world sales, but really it's set in the second ringing of the bell of the LME. So everybody that's buying aluminum references that price first as the base price for aluminum, and then they add on the Midwest premium, which takes into storage, insurance, taxes, transportation, and that's why that is in addition to the LME price. Now, the defendants argue that there is some inverse relationship between the LME price and the Midwest premium. In other words, as this premium skyrocketed, that somehow the LME price, you know, dropped down. That's not the case. Not a single industry participant found that to be the case. You have some evidence of that in the record that at least at some points, if you do a graph, you see the LME price going up even as the Midwest premium goes up at the same time. Absolutely. Statistically, the experts that took a look at it, it's a 95% statistic, a match of those two things going up. Yes, they used the warehouse. When this case was first brought, everybody knew about or had learned or were learning about the warehouse activities, and big first-level purchasers like Novalis, the biggest aluminum user, one of the biggest luminaries in the country, couldn't understand what was happening in the record at different points. Couldn't understand what was happening because this Midwest premium, historically, had gone down in times of big supply. And here it was, skyrocketing, and what was happening? Well, what was happening is that the defendants, of course, were lengthening the queues, increasing the storage cost, which was picked up in the real world where the Midwest premium was paid. The Midwest premium is only paid in the real world, so people in the warehouse LME market, they don't care. They're not paying the Midwest premium. They're paying whatever the LME prices they trade. The speculators, in effect, the traders of futures. Yes. But what we didn't understand at the time when we first brought this case is that the defendants had stepped in to become some of the biggest purchasers of aluminum in the country. Goldman Sachs and J.P. Morgan went from owning no aluminum prior to purchasing the LME warehouses to becoming some of the biggest purchasers of aluminum in the country. In 2012, they owned 75% of one year's consumption in the country, and more than $10 billion worth of aluminum. They talk about how all this activity all took place over here in the warehouse market. The warehouse market was nothing compared to the billions and billions of dollars of aluminum that they had. And, Your Honor, you ask, well, didn't they hurt themselves by raising this Midwest premium that they would have to pay? And it really is, as said before by counsel, it was part of the long game. They were purchasing aluminum in part in the LME warehouses and bringing it out, but they were also purchasing non-LME aluminum. That was in non-LME warehouses and available for the market under ordinary, like anything else that's for sale that's in a warehouse. Yes and no, but aluminum really is sold based on this LME price plus. So if you're, like, if you're one of my clients or proposed clients, and I represent four actual direct purchasers, you pay the LME plus the Midwest premium. You can't get away from it. That was the testimony in front of Congress. Well, but I mean, did your clients have long-term supply contracts that referenced the Blatt's price? Yes. What it references, it says, we will sell you aluminum for the next year based on the LME price plus the Midwest premium. Right. So you don't have an option, really, to go to a spot, even assuming that suddenly this year the supply and demand price of aluminum at the smelter might be going down. You've already got a contract where you've agreed to pay according to a price that's pegged to certain market indicators. Is that the idea? In part, you're stuck, okay, and we're big manufacturers, and so there's only 286 of them. It's a finite class. So in part, you're stuck, but that's not necessarily the case. The LME warehouses were supposed to act as, as you said, a place to go for the last resort, the marginal supply, in case you go there. And it's supposed, and the reason that it was so important is to bring price convergence. So you didn't get stuck in the situation that you're talking about where you've got some kind of anomaly. Let's say there's snow in the northeast, and it's just, you have one of the bomb blasts that I was lucky enough to be here for, and you, and all of a sudden, certain things skyrocket. Well, you could go to the LME, and Novalis did go to the LME, and you could order some aluminum. When they bought these things, the wait for aluminum was a couple weeks. That was the norm to get it out of the LME warehouse, to keep that price convergence. By the time, after two years of what they were doing, it went out 700 days. So Novalis goes to see how far out it's going. It takes them four and a half months to get aluminum. They make aluminum cans for Coca-Cola, but they buy a primary, they're a primary direct purchaser, and they knew that that was no longer a place where they could get their aluminum as a last resort. So what happened is the defendants go out and buy billions of dollars worth of aluminum, and they sell it to our clients. We bought tens of thousands of metric tons directly from these defendants here. They made some argument that we waived that. That's not true at all, and I can show you in the record several times. At page 46 of the very brief they cite, that we somehow waived our purchases from them. We had not calculated at the time of class cert our damages for the direct purchases from them, because we were still sifting through that thing. But we were further along, right. We had finished discovery, and we had also opposed their motion to dismiss with an opposition, basically a summary judgment with these facts that indicate. It gets me to a question, and I understand that these other folks, your colleagues here, had complaints that had not yet even been addressed by the defendants. But you're in a somewhat different procedural posture, right. You've had some discovery, and at least some of the rulings that the district court made seemed to me to be turning, like for example, not allowing you to amend the complaint to bring in the Vlissingen allegations as part of it. That was based on a theory that you've been at this for a while, and I don't know whether you were at or near the end of discovery when these motions took place, and therefore it would be unreasonable to allow you to amend your complaint in a way that would crank up a whole additional set of discovery. Do you have a response to that? Certainly the district court was concerned about that, and certainly I understand that. You know, you can't throw in at the end some new theory. But that was not the case. The third amended complaint, which is the backbone of what the district court ruled on, it stated there were two markets. There was the warehouse market, and there was the physical aluminum market. And then it went through and documented that plans competed in the physical market for producers' metal against defendants' metros incentive payments, and that's at the TAC 9D-158-414. Glencore, J.P. Morgan, Goldman Sachs sell to industrial users such as plaintiffs. Paragraph 603. Defendants did this to make their own physical holdings, which dwarfed their warehouse investments, more valuable. You've always, or at least since the third amended complaint, been arguing that the conspiracy was aimed at the physical market. Yes. Now, that's a somewhat different question than this Glusingen theory. Yes. But the idea is, I guess your argument is, since you've always made that general point and now these maybe newly discovered facts or something have come to light about what was going on in the Netherlands. The Netherlands is, I won't say it's a side issue. It's another example of where J.P. Morgan took 760,000 metric tons, okay, put it in a competitor's warehouse, agreeing not, when they took it out, they canceled the warrants and extended the queue. They were trying to do a worldwide squeeze. They agreed not to sell it to anybody else. You know, so talk about against interest. Put it in somebody else's warehouse. You own warehouses. You agree not to sell it when you take it out, that you'll take it back to your own warehouse. And they did that to extend the queues. They did that in their own words. And we have the documents, and you've seen some of them. In their words, they did it to create our own Detroit. Okay? Think about this. J.P. Morgan and Glencore, who both of them. But you just said something that is confidential, that is, that anybody sitting in the audience who read the redacted briefs wouldn't know. I don't know if I said something that they can say. I'm just wondering because, you know, I think that's one of the facts that I didn't appreciate on the first go-round, was all of these documents that you're now referencing. That's not to criticize you. It may be because nobody jumped up on the other side and said, these guys can't say this, but that is relevant to whether those briefs should be eventually redacted. But that's my side obsession. I tend to like First Amendment access to the briefs that are filed in this court. I'm sorry, I interrupted you. Yes, they've been trying to keep some of these facts out forever, but we went overseas, we took these depositions, so we discovered exactly what was going on and for how long and really what the object of the conspiracy really was, that it was to the extent the warehouse market was used as a tool to raise the Midwest premium, which is only paid in the physical market. But we also have a competitor. We also competed with the defendants for the purchase of primary aluminum from the smelters. They were in competition with us for that. They say, oh, you're complaining now about competition. Well, it's competition if it's fair competition. But you can't go out and buy a year's supply of consumption of aluminum, slap it in a warehouse and essentially hoard it while you're driving up the Midwest premium and increasing the prices to everybody else that needs to use that aluminum right now. They can't afford to wait for a year in their manufacturing capacity, and that's what they did. And then they trickled out this aluminum directly to us because we are the purchasers of the primary aluminum that they store. It's a pure aluminum, very pure aluminum, and that's what was held in the aluminum warehouses. Is that a different theory, though? I mean, one issue is they are restraining competition in the market in which they sell to you. But this sounds like a somewhat different theory in which they are somehow affecting competition in the market in which you and they both buy. I think it's complementary. They were hoarding aluminum so they could sell it to us at a higher price. So our theory is the same as their theories. It's a classic antitrust injury. They were hoarding aluminum. They had to hoard it to sell it to us and make their money, and they sold it to us at an inflated price. So that really is the crux of that argument. So I'm not trying to change arguments there, but we also say, hey, that hoarding and everything also had an impact because they make a big argument that there was a surplus during this time. There was not a surplus in the sense that it was available to us, and that's what our argument is. There was what they call a contango, where near-term prices are lower than expected for long-term prices. So traders such as these entities would purchase aluminum holding it for the future. Eighty percent, at the start of this class period, almost 80 percent of available aluminum was held up in these warehouses just because you can put aluminum out in a cow pasture, as they noted, and nothing happens to it. It doesn't degrade or anything. So it was off the market and not available for us. And then they put in the squeeze, and as their own defendants say, Metro's CEO, Chris Wibbleton, physical traders in conjunction with banks, producers, hold stock, and withhold metal sales to consumers in order to squeeze up premiums, and that's a JA-1695. Your time is up, but you have some time for rebuttal. Thank you very much. Thank you. Thank you, Your Honor. May it please the Court. Richard Pepperman on behalf of the defendants. Can you talk into the microphone? Yes, Your Honor, my apologies. Your Honor, the conspiracy claims, the allegations of anti-competitive conduct, and the alleged harm at issue here are exactly the same as those that were at issue in Aluminum III. The only difference between these cases and Aluminum III is the plaintiff's application on the chain of distribution. Whereas the plaintiffs here claim to have bought aluminum directly from either a smelter or a trader defendant at the top of the distribution chain, the plaintiffs in Aluminum III purchased fabricated aluminum or aluminum products further down the chain of distribution. But that difference could not have had any legal relevance in Aluminum III because the plaintiffs there sued under state statutes that eliminate the distinction between direct and indirect purchasing. They did, but then when the panel got around to the state claims, it seems to me that the reason why the state claims were dismissed was because the allegations under the state claims were conclusory or something like that. There's no analysis of those state claims that addresses this particular theory in any direct way. It's two paragraphs, and all it says is this is all conclusory. We don't have to deal with it. Your Honor, I beg to differ. The state law claims that are addressed in the two paragraphs in Roman II are the consumer protection and unfair trade statutes. The state antitrust claims are what are addressed in Roman I because the plaintiffs there as indirect purchasers sued only for injunctive relief under federal antitrust law and for damages under state antitrust law. So the Court notes in the paragraph before Roman Ia that the claims for money are under the state antitrust law. So the paragraph, I mean Section I of Aluminum III addresses simultaneously the claim for injunctive relief under federal antitrust law and the claim for damages under the state antitrust statutes that are the Illinois brick repealer states. What puzzles me about all of this, though, is that although I think I did find certainly in the complaints and possibly in the briefing to this Court theories being floated that are analogous to the ones that these plaintiffs allege, it's very hard for me to read the opinion and find anything that addresses those theories. This opinion reads Macready, Macready, Macready. And I can only take from that that that was how the Court perceived those plaintiffs as primarily structuring their claims. Am I wrong about that? Where is there an actual discussion of a direct seller theory, a direct traditional antitrust injury claim in Aluminum III? Your Honor, the lead-in, the Roman I and Roman Ia of Aluminum III addresses generally the law of antitrust injury. Your Honor is correct that the commercials and consumers in their brief before this Court argued first that they suffered antitrust injury under Macready and argued in the alternative that they suffered classic or traditional antitrust injury based on a supply restraint. That also was argued at oral argument. They argued that there was an output restriction. Judge Rustani. I hear you. And so you are saying that we are fairly bound by Aluminum III to reject claims that were made to the panel in Aluminum III and implicitly, in effect, rejected, right? Because, I mean, I didn't hear you. I didn't hear you. You were telling me that these claims were made to that panel and were discussed at oral argument, but you haven't said yet, disputed, that there's some place in Aluminum III where the Court actually analyzes this kind of claim and says, here's why it fails. Your Honor, the panel did in this respect. The paragraph that begins the upshot, the Court is articulating a general test of antitrust injury that applies regardless of the theory of antitrust injury on which the plaintiffs rely, where the Court says that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained. Okay. Now help me out. Let's pretend for a moment that we are not bound by Aluminum III and we're evaluating this issue de novo. How can that be right? That is to say, how can it be the case that if it is true, as alleged in the complaint, that this whole warehouse thing was just a way to fix a component of the price in the direct purchase aluminum market, that someone who is injured in the very market at which the defendants aimed. I understand you're going to say this didn't happen, but that's the point. How can it be that someone who is injured in that market does not have traditional antitrust standing? Your Honor, and I'm glad Your Honor raised the complaints, Mr. Brandt's complaints representing the individual plaintiffs. In the injury section of the complaint, what the IPs allege, and it's paragraph 314 of the joint amended complaint, and it's paragraph 319 of the first amended complaint filed by Fuji, but what they allege is that the defendant's conduct impaired competition among suppliers of warehouse services and that this in turn had a predictable and foreseeable effect on the market for aluminum. And I believe what the panel did in Aluminum III is articulate a general rule of antitrust injury that to suffer antitrust injury, you must be a participant in the directly restrained market as opposed to being a participant in a separate market. I'm hearing you, but let me follow up. So are you hinging this argument then on the idea that they have not in fact alleged that the conspiracy was aimed at this market? You're saying they alleged that there is a conspiracy to directly restrain the warehouse services market that had a foreseeable, proximate, causative effect in some other market. And in that scenario, the logic of Aluminum III makes a lot of sense. But are you also telling me that if they had alleged that there was an intended conspiracy that in effect, like in McCready itself, only aimed at the warehouse people, they're the collateral damage. Nobody cares about a few extra dollars in rent. If they allege that the main thing this is aimed at is the aluminum supply market, that it would still be the case under this upshot paragraph that because the direct targets of an antitrust conspiracy were not operating in the market in which the maneuvering took place, in which the actual shenanigans took place, they don't have traditional antitrust injury. Yes, Your Honor, for two reasons, if I may. The first is that the law is clear that specific intent is not sufficient to show antitrust injury. Going back to Aluminum III, the same point that Your Honor makes here was made in Aluminum III, and the court directly addressed it. The court said, undaunted, the commercials and consumers allege that defendants intended to corrupt the market for primary aluminum. So that same argument of specific intent was made there, but that was not sufficient because those plaintiffs did not participate in the directly- Can you cite me, like, is there some Supreme Court case or some Second Circuit case that established that before Aluminum III? I can cite you two Supreme Court cases. The first is McCready, where the Supreme Court wrote, and I'm quoting, quote, the availability of the Section 4 remedy to some persons who claimed its benefit is not a question of the specific intent of the conspirators. And that's specifically in the context of talking about antitrust injury. The very next term, in Associated General Contractors, the Supreme Court picked up on that language from McCready and reiterated that an allegation of improper motive is not a panacea that will enable any complaint to withstand a motion to dismiss. And the courts of appeals, following that language from the Supreme Court, have determined uniformly that specific intent is neither a necessary nor a sufficient ground to establish antitrust injury. It is relevant, Your Honor, under the efficient enforcer factors in the second part of antitrust standing, but it's not relevant to antitrust injury. What antitrust injury looks at, and if you look at what the Supreme Court said in Associated General Contractors, it looks at the harm suffered by the plaintiff, the wrongdoing by the defendants, and the relationship between the two. And here, the alleged wrongdoing by the defendants directly restrained the warehouse services market. That's what this Court held in Aluminum 3, that the contact took place, if at all, in the LME storage warehouse market, and that is where the direct effect was felt. So that's where the direct restraint occurred. What these plaintiffs are complaining about is an effect in a separate market. And just because they layer on top of it allegations of specific intent does not distinguish it from Aluminum 3 and runs headlong into what the Supreme Court held in McCready and Associated General Contractors. So I'm still having a lot of trouble with this, because the idea is that, again, we're assuming the truth of something that may not even be plausibly alleged, I don't know, but that if it is the case that the defendants deliberately conspired to screw up the LME warehouses in such a way that would have a direct impact on the price paid in the aluminum market, and they did that in order to be able to profit in the aluminum market by fixing a component of the price, the same way that the LIBOR defendants affected a component of the price of money, and that the people who were the targets of that conspiracy, who paid inflated prices that it was the whole point of the conspiracy to create, do not have an antitrust injury? Is that what you are saying to me? Yes, Your Honor. If I could make two points to respond to that. The first is, and I think it's you. That may be the law. I just want to understand how that can be. Your Honor, I think what I'm arguing is what the Court held in Aluminum 3, but I want to go beyond Aluminum 3 and address Your Honor's point at first principles. I think that would be helpful. First, I think it's useful to explain why this case is different from Gelboim. This case would be on all fours with Gelboim if what the defendants had done was made, conspired to provide fraudulent submissions to Platts in calculating the benchmark, or they had agreed to engage in manipulative or sham transactions in the spot market and then reported those prices to Platts. Because that there would be conduct that directly restrained the physical aluminum market and that directly manipulated a benchmark that was used in pricing. What's alleged different here is there's not a claim here that there were fraudulent transactions in the spot aluminum market. The claim is instead that the defendants failed to compete in the warehouse market, that that created lengthy warehouse queues, that that drove up the cost of storage, and that the cost of storage had an effect on the Midwest premium. It's that indirect nexus that distinguishes it. The second point, Your Honor — Well, but again, and also that that was the point. But again, let me just follow up. You were saying that's distinguishable because if they had arranged fraudulent transactions in the warehouse market and reported them to Platts, that would be like live work. No, Your Honor. I said if they had engaged in fraudulent spot aluminum transactions in the aluminum market. So if — and you see this, for example, the district court's recent decision in the Brent crude oil case, where traders are alleged to have engaged in manipulative or sham spot transactions in the physical market with an effort towards manipulating a benchmark. That would be a direct restraint of the physical market that directly manipulated a benchmark price. And why on earth would we want, for any policy reason related to the antitrust laws, to distinguish that from a situation in which, in effect, the plaintiffs are alleging that you folks engaged in really fraudulent transactions, bouncing things back and forth between warehouses, for example, in order to affect a component of the benchmark? Why is that different than a fraudulent spot market transaction, which would have the exact same impact on the market? Your Honor, I address the specific intent point. Let me focus on the policy point. The reason why courts have limited antitrust injury to participants in the directly restrained market is twofold. One, it is the powerful draconian treble damages remedy that those plaintiffs have. And the risk of what they say is over-deterrence if that treble damages remedy is then given to participants in separate markets. And second, Your Honor, it is the complexities of tracing an effect on price from one directly restrained market into a separate market. And what I would like also to do, because I— Again, that makes a lot of sense if we're talking about something like Illinois BRIC, some situation in which it's hard to see how this passes through or something like that, because the economy gets very complicated once you're beyond one level. But in these unusual circumstances where at least we are told that the price of aluminum is determined by benchmarks, and certainly that may be true as to supplier contracts where people have an indeterminate price term that's pegged to a benchmark, if you can screw up the benchmark somehow, you are directly restraining that market, aren't you? Why isn't that a direct—it may be done by some shenanigans that also violate the antitrust laws as opposed to some other way. Your Honor, if I may make two quick points in response to that. First, I submit, Your Honor, that the calculation of calculating the effect of cues in an LME warehouse on the all-in price of physical aluminum in the physical aluminum market is just as complicated as the pass-through analysis that the Supreme Court addressed in Illinois BRIC. Second— Can you help me out with this? Because this goes to how does the BLATS thing really work, right? And maybe this is just a factual issue and that creates a problem with dealing with it at the pleading stage. I thought your argument, in part, which was very interesting to me, was that this is not like LIBOR because the formula—it's not a formula. And I thought the plaintiffs were suggesting in their briefing that what happens is BLATS has some kind of formula that in some way references the cues and what's happening in the warehouse and all that sort of stuff, and you do the formula and you get an X number, which you then add to the LME price, and that creates their number. And I thought you were saying that, no, in fact what happens is BLATS is referencing the actual transactions that take place in the real world and then saying this is the benchmark because this is the average that's being paid, and then the Midwest premium is really just subtract the LME price from that. Your Honor is exactly right, and there's no dispute about that. What BLATS does is it surveys purchases in the spot market, and it calculates something called the Midwest transaction price, which is the price at which aluminum is being bought and sold in the physical market. They then take that Midwest transaction price and they subtract from it the LME cash price, and the difference is the Midwest premium. So if cues have the effect of depressing the LME cash price relative to the physical aluminum price because warrants for aluminum stored in LME warehouses are less valuable, that has the effect of increasing the Midwest premium, although it has no effect at all on the overall price. But then that raises two questions. It raises one factual question, which is what do you do with the evidence that the LME price doesn't seem to be going down at the same time as the Midwest premium is going up factually? But then question two, why isn't that all a fact question? Well, Your Honor, I mean, I will concede that that is all a fact question, but there's an important thing to recognize in terms of the similarities between this case and Aluminum III. The commercials in Aluminum III also allege that pursuant to their supply contracts, they paid the Midwest premium. The commercials supply contracts in Aluminum III were the LME cash price, the Midwest premium, and some additional cost for fabrication. So the fact that the plaintiffs here pay the Midwest premium and it's in their supply contracts does not distinguish these cases from the commercials in Aluminum III. The commercials don't have an Illinois brick problem. Unlike the consumer plaintiffs in that case? The commercials did not have an Illinois brick problem because they sued for damages under state Illinois brick repeal statutes. And they didn't have an Illinois brick problem under federal law because they sought only injunctive relief. It seems to me there's an astonishing artificiality to your argument. I mean, it brings to mind the notion that if someone, for example, if someone chops down a tree that is in some manner illegal as chopping down a tree, but he does it for the purpose of having the tree fall over and crush a house. Oh, well, that was indirect. That's not covered. Or if somebody closes off a water supply that goes in for cattle to get water and the cattle all die, and that's the purpose of doing it. I'm closing off the water supply in order to kill the cattle. No, no, that can't be an injury that one contemplates because it's indirect. The only injury was just to the water, not to the cattle. I mean, I just don't understand the argument. I mean, I understand the elegant choice of words to achieve it with, you know, words like indirect and different market. But when one is doing the illegal conspiring for the express purpose of raising a number, which will then translate into raising the price of aluminum in this market, and that's the only reason that you do it. You're on a little baffling to hear these elegant lawyers' arguments. No, no, no, no, that's not. You don't understand antitrust injury. Your Honor, I'm not suggesting the court doesn't understand antitrust injury. No, no, no. If you suggest that, you'd be probably right. I mean, at least as far as one-third of the court, I'd confess. I take the question very seriously. So let me respond to it. Your Honor, the notion that the conspiracy alleged here was solely a conspiracy to increase the price of physical aluminum is, quite frankly, a post-aluminum III invention. Throughout this case, the argument has always been that the defendants did this in order to increase warehouse rent, that people, because as Mr. Coughlin pointed out, there was a two-year queue, that users of warehouse services were forced to pay daily rent while they waited in a queue for two years to take them out. And the claim was that that increased storage had an effect in the physical aluminum market. And that's the point I made based on paragraph 314. That was the point of Judge Jacob's opinion in Aluminum III. He says they disavow any participation in the market. But they are telling us they don't disavow it. They, as opposed to whatever might have been the case in Aluminum III, they are very much avowing that the purpose of the manipulation of the LME warehouse market was to increase the prices. The defendants could charge and that the plaintiffs would have to pay in buying aluminum. Your Honor, I want to be clear about what that sentence means. The court said that the plaintiffs in Aluminum III disavow participation in the markets in which defendants operate. Your Honor, that is simply another way of saying that the plaintiffs in Aluminum III were indirect purchasers who bought their aluminum further down the chain of distribution. The plaintiffs in Aluminum III bought either fabricated aluminum or aluminum products, things such as aluminum foil or aluminum boats. The defendants here don't sell fabricated aluminum. They don't sell aluminum foil or aluminum boats. So when they said that they disavowed participation in which the defendants operate, that simply meant that they bought the aluminum further down the chain of distribution and therefore did not participate in the markets in which the defendants participated. So then who would have suffered antitrust injury in this situation that would have a plausible claim and that would have the incentive to bring this kind of action? Your Honor, two classes of plaintiffs. They would be consumers or competitors in the allegedly directly restrained market for LME warehouse services. Would they have an incentive to bring an action like this? They would, Your Honor, if they thought that there was an antitrust violation because the claim would be is they had aluminum in the warehouse. They canceled their warrant. They wanted to take it out and they had to pay daily rent for over two years because a queue had been generated by illegal collusive conduct. And I think it's noteworthy. There ought to be a lot smaller effect on the national economy than the price of aluminum that goes into everything that people buy. Your Honor, that's my tracing point. That's part of what antitrust injury does. Those are the profits that you're alleged to have made. You're alleged to have made profits in that market that had the effect of raising the price, the intended effect of raising the prices in that market. So, I mean, it's a little disingenuous, isn't it? Again, assuming the truth of the allegations in the complaint to say, oh, we're going to be stuck with enormous damages if the whole point of this was to get enormous profits that those damages are keyed to. Your Honor, keep in mind that three of the defendants here, Metro, Henry Bath, and Pecorini, are warehouse operators. They enjoyed the profit from the allegedly inflated- They're wholly owned subsidiaries of the various trading companies and either Goldman Sachs and J.P. Morgan and I forget, Pecorini or- Glencore. Glencore is the principal. I thought your answer to me and your answer to Judge Droney were inconsistent with one another. You were saying to me that the language disavowed participation was because they were down the line users of fabricated aluminum as opposed to buyers of aluminum in the direct market. And then you said to Judge Droney, when he asked who would be able to challenge, it was only people who were users of the LME warehouse services who said, hey, we have to wait too long. We're having a problem in being charged too much storage because we'd like to get our aluminum out earlier. Your Honor, with all due respect, I don't think the answers are inconsistent. The aluminum three plaintiffs obviously also were not participants in the warehouse market, so that is another distinction from then. I was making the point that the difference between these plaintiffs and the aluminum three plaintiffs. The only substantive distinction among these plaintiffs is that these plaintiffs bought aluminum at the top of the distribution chain and the plaintiffs in aluminum three bought aluminum further down the distribution chain. And for the commercials, it was just one step below. I mean, the commercial end users alleged that they bought aluminum from these plaintiffs and that they too directly paid the Midwest premium. So, of course, if these plaintiffs paid an inflated Midwest premium, that was passed on directly to the commercials. But this court held in aluminum three that the commercials did not suffer antitrust injury. And it's noteworthy what the court also said is that the plaintiffs failed to allege and could not allege antitrust injury because what the aluminum three plaintiffs had asked for, they asked this court, give us an opportunity for leave to amend. If we're given leave to amend, we're going to copy the third amendment complaint, that's the operative complaint of the class plaintiffs. We're going to copy that complaint verbatim. Give us a leave to amend. And what this court said is that they failed to allege and could not allege antitrust injury. And the reason for the could not allege is they just couldn't plead around the fact that they didn't participate in the directly restrained LME warehouse services market where all the anti-competitive conduct occurred. And one of the real fallacies here is the analogy to McCready. As I understand it, one of the arguments they make is that the warehouse customers are the McCready plaintiffs, that the warehouse customers are the fulcrum. But, Your Honor, just think, if you were representing a warehouse customer, you would never claim that you were a McCready plaintiff. You would say, I'm a direct customer of the defendants. I purchase warehouse services from the defendants, and I'm a consumer in the directly restrained market. So I suffer classic traditional antitrust injury. So the whole analogy that the warehouse customers are McCready plaintiffs and that they're then the equivalent of the psychologists in McCready or the trade show in Krimper's or the supermarket in Hanover 3201 Realty is based on the false premise that the warehouse customers are McCready plaintiffs. They're not. They're direct customers of the defendants in the directly restrained market. Thank you, Mr. Peppermint. Thank you. We'll hear some brief rebuttals. Mr. Brandt. Thank you, Your Honor, very briefly. To address the issue of the potentially inconsistent responses to Your Honors about disavowal of participation in the market, if we look at exactly what Aluminum 3 told us when it said that the commercials and consumers disavowed participation, it's that they did not store aluminum in the defendants' warehouses, they did not trade aluminum futures contracts with the defendants, and they do not allege that any of the aluminum they purchased was ever stored in any of the defendants' warehouses or was the underlying asset for any of the defendants' futures trades. Nowhere in here is a discussion of are the defendants sellers of massive amounts of aluminum, because if that were known to the court in Aluminum 3, then the court would have had to explain how those plaintiffs were not in a market with the defendants in that context. There can be no question that we have alleged and long maintained that this was about a price in the physical market. Long before Aluminum 3 came out, 18 months before Aluminum 3 came out, in our January 2 reply brief 2015 to the district court, we told the court in support of our motion for leave to file the JAC, so it's not even an operative complaint at that point, the JAC alleges straightforward antitrust injury to IPs in the market for aluminum such that the court need not even engage in an inextricable intertwinement analysis. That hit such a mark with the defendants that they sought leave to file a SIR reply, got their leave, and came in and complained to the district court that we were not arguing McCready and that we somehow had abandoned an inextricable intertwined theory. Not so. Our theory has always been at least that we argued classic antitrust injury. Thank you, Your Honors. Mr. Palmeshian. Just a couple of quick points. I think Mr. Pepperman did a very good job of sort of shuffling between the district court's order and Aluminum 3 and trying to portray this fallacy that somehow the Aluminum 3 court understood that his clients were actually in the physical aluminum market. Just put aside for a second the fact that the consumers and commercials disavowed, but just take on Mr. Pepperman's statement that they couldn't amend to track the FLPs and that's somehow because the court understood that they were still in the physical market but somehow had this other problem. But if you look at Aluminum 3, the court says there when talking about what had happened with the FLPs, it says in that order, which is not the subject of this appeal, the district court concluded that the purchasers, while not participants in any of the defendant's markets, still had some sort of injury. I mean, his whole argument that, oh, as in directs, they should have had standing, it was decided, it falls apart at that point. I think his argument and his analysis of Aluminum 3 runs headlong into this court's decision in Gelboyne, United States Apple, and Socony. And the only explanation for how that case came about is not that, you know, in August of 2016, this court decided Aluminum 3 and did a complete 180 from Gelboyne, which it decided three months earlier. It all turns on the simple holding that that court concluded that the defendants were not in the primary aluminum market. Only way you can rationalize and explain that decision. Thank you. Thank you. Mr. Coughlin. Just very quickly, Your Honors. I wanted to... There was a discussion here about who would have the incentive, the people in the warehouse that were charged extra rent. If you read the facts of this case, you find out that what they did was they paid four big entities besides themselves to cancel warrants and return the aluminum in a circle in Detroit to bring it back in. So the idea that there were somehow people in the warehouse impacted, that's not the case. Why didn't they sue them? Because they actually were paid to cycle their aluminum in a circle. Red Kite and three other entities were paid literally $100 million to move aluminum in a circle and agree to bring it back into the warehouse. Then these three defendants stored aluminum in the Detroit warehouses, even though they had their own warehouses, and canceled warrants too. There was nobody in that queue unless you got paid for it. There was nobody in that queue except people that they were paying off to be in there to lengthen that queue. And that's not how the LME pricing works. The LME pricing works out in the real world. That Midwest premium is set out in the real world on availability, supply, and demand, and it includes the cost of getting things from the warehouse. They know basically what's happening with the queue and the storage costs. And that... Essentially, if one regards the antitrust injury as the one to the participants in the warehouse market, there was no injury. No, and nobody ever complained. Nobody in that, quote, market that was so impacted ever made a complaint. Thank you, Your Honor. Thank you, Mr. Coffman. Thank you all. We'll reserve decision.